## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PRYSMIAN CABLES & SYSTEMS USA LLC,<br>    *Plaintiff*,<br><br>    v.<br><br>ADT COMMERCIAL LLC,<br>    *Defendant*. | No. 3:22-cv-836 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Prysmian Cables and Systems USA LLC ("Prysmian" or "Plaintiff") has sued its security system provider, ADT Commercial LLC ("ADT" or "Defendant"), alleging that Prysmian's facility was burglarized after ADT disarmed Prysmian's security system without informing Prysmian or receiving the required authorization from Prysmian employees. Compl. ¶¶ 3–4, ECF No. 1. Prysmian asserts claims for breach of contract, common law recklessness, fraudulent and negligent misrepresentation, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). *Id.* ¶¶ 31–66.

ADT has filed a motion to dismiss, arguing that the parties' contract bars recovery for Prysmian's alleged losses. Mot. to Dismiss, ECF No. 10. ADT also contends that Prysmian's other claims fail because they are insufficiently pled and are based on the same allegations underlying the breach of contract claim. *See id.*

For the following reasons, ADT's motion to dismiss is **GRANTED in part** and **DENIED in part**.

ADT's motion is granted as to the claims for fraudulent and negligent misrepresentation and denied as to the claims for breach of contract, recklessness, and violation of CUTPA, and as to the request for punitive damages.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

According to the Complaint, Prysmian operates a facility in Willimantic, Connecticut, where it manufactures energy, telecommunications, and fiber optic cables. Compl. ¶¶ 2, 11. This facility allegedly stores valuable commodities such as copper that make it a potential target for thieves. *Id.* ¶¶ 2, 14.

To mitigate the risk of theft, Prysmian allegedly hired ADT to provide security and surveillance services at three Prysmian facilities, including the one in Willimantic. *Id.* ¶¶ 3, 17. In July 2020, the parties allegedly executed a Service Agreement (the "Agreement") governing the services ADT was hired to provide. *Id.* ¶ 17; Ex. A to Compl. at 17–25, ECF No. 1-1 ("Service Agreement"). These services allegedly include a surveillance camera system that notifies human operators when it detects suspicious activity. Compl. ¶ 19. Prysmian alleges that ADT can disarm this system, in which case the surveillance cameras will register activity but will not activate an alarm or notify human operators of suspicious activity. *Id.*

The Agreement allegedly requires ADT to "comply with any requirements and policies provided by [Prysmian] in connection with this Agreement. Service Agreement § 8. In accordance with this provision, Prysmian allegedly instructed ADT that it must obtain approval from two specific Prysmian employees before disabling the security system. Compl. ¶ 3.

### 1.  The Theft at the Prysmian Facility

The theft allegedly occurred on the evening of November 7, 2021. *Id.* ¶¶ 23–29. Earlier that day, the surveillance system had allegedly produced two false alarms, allegedly a frequent occurrence for Prysmian. *Id.* ¶ 24. According to the Complaint, ADT "apparently wanted to avoid having to deal with" these false alarms and so, at 6:05 p.m., decided to disarm the system.

*Id.* Prysmian alleges that ADT failed to obtain the required approvals from the two designated Prysmian employees before disarming the system. *Id.* ¶ 25.

Around 7:32 p.m., two masked individuals allegedly arrived at the Prysmian facility and began stealing copper wire. *Id.* ¶ 26. The thieves were allegedly caught on the surveillance cameras, but the disarmed system did not trigger an alert. *Id.* According to the Complaint, the thieves were still at the Prysmian facility at 8:43 p.m., when ADT conducted a periodic "video guard tour." *Id.* ¶ 27. But ADT allegedly failed to observe the thieves because it had allegedly refused to repair defects in several of the cameras on Prysmian's property. *Id.*

The next morning, Prysmian allegedly informed ADT of the theft, at which point ADT allegedly re-armed the security system. *Id.* ¶ 29.

As a result of the theft, Prysmian allegedly suffered losses, including copper wire that was stolen or damaged and the cost of a guard service to replace ADT's allegedly ineffective alarm system. *Id.* ¶ 30.

### 2. The Relevant Provisions of the Service Agreement

As noted above, the Service Agreement required ADT to "comply with any requirements and polices provided by Customer in connection with this Agreement." Service Agreement § 8. Section 8 also requires that ADT perform the services provided under the agreement "in accordance with sound and generally accepted practices and procedures and normally accepted standards in the field." *Id.*

Section 13(b) of the Agreement contains additional provisions that purport to limit ADT's liability for losses related to its security services. It provides as follows:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, SERVICE PROVIDER OR ANY PERSON OR ENTITY AFFILIATED WITH SERVICE PROVIDER SHALL NOT BE LIABLE FOR ANY LOSSES

ARISING DIRECTLY OR INDIRECTLY FROM ANY SYSTEM FAILURE EVENTS. IF SERVICE PROVIDER OR ANY PERSON OR ENTITY AFFILIATED WITH SERVICE PROVIDER IS DETERMINED TO BE LIABLE FOR ANY LOSSES DUE TO A SYSTEM FAILURE EVENT IN ANY RESPECT, THEIR LIABILITY SHALL BE STRICTLY LIMITED TO $50,000.00 PER CLAIM, AND $500,000.00 AGGREGATE FOR ALL CLAIMS, AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY. THIS AMOUNT IS CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, REGARDLESS OF WHETHER THE LOSSES ARE CAUSED BY SERVICE PROVIDER'S NEGLIGENCE (ACTIVE, PASSIVE OR OTHERWISE) UNLESS SUCH LOSSES ARE CAUSED DIRECTLY BY SERVICE PROVIDER'S SOLE OR GROSS NEGLIGENCE, OR INTENTIONAL MISCONDUCT; IN WHICH CASE THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY.

*Id.* § 13(b).

The "System Failure Events" referenced in § 13(b) are first mentioned in the prior subsection, which describes ADT's obligation to indemnify Prysmian. Under this provision, ADT's obligation to indemnify Prysmian "shall not apply to Losses not attributable to Service Provider arising out of the condition, non-function, malfunction, faulty design, or failure of the Equipment to operate or perform as intended ('System Failure Events')." *Id.* § 13(a).

### B. Procedural History

On June 7, 2022, Prysmian filed its Complaint in Connecticut Superior Court. Notice of Removal at 1, ECF No. 1.

On July 1, 2022, ADT removed this case to federal court on the basis of diversity jurisdiction. *Id.* at 1–2.

On July 22, 2022, ADT filed a motion to dismiss. Mot. to Dismiss; Mem. of Law in Supp. of ADT Commercial LLC's Mot. to Dismiss, ECF No. 11 ("Mem.").

On August 11, 2022, Prysmian filed an opposition to ADT's motion to dismiss. Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss, ECF No. 16 ("Opp'n").

On August 17, 2022, the parties filed a Rule 26(f) report, and the Court issued a

scheduling order the next day. Joint Report of Parties' Planning Conference, ECF No. 19;

Scheduling Order, ECF No. 20.

On August 25, 2022, ADT filed a reply in support of its motion to dismiss. ADT

Commercial LLC's Reply in Supp. of its Mot. to Dismiss, ECF No. 21 ("Reply").

## II.   STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon

which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a

complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo

working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]

to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of

a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a

complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at

679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible."

*Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*,

589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court

takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views

the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.   DISCUSSION

ADT argues that Prysmian's breach of contract claim should be dismissed because ADT has not identified a specific contractual provision that ADT allegedly breached and because the Agreement precludes liability for Prysmian's alleged losses. Mem. at 5–8. ADT also contends that Prysmian's tort claims and CUTPA claim are duplicative of the contract claim and that Prysmian has not alleged sufficient facts in support of these claims. *Id.* at 8–17.

The Court will address each of Prysmian's claims in turn.

### A.  The Breach of Contract Claim

Under Connecticut law, a breach of contract claim has four elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and

(4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014).

When the language of a contract is "clear and unambiguous," the contract must be "given effect according to its terms, and the determination of the parties' intent is a question of law." *Nation-Bailey v. Bailey*, 316 Conn. 182, 192 (2015). When the language is ambiguous, however, "the determination of the parties' intent is a question of fact." *Id.* Thus, under Connecticut law, a court may dismiss a breach of contract claim only if the terms of the contract are unambiguous. *See id.*; *see also Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." (applying New York law)).

"A contract is unambiguous when its language is clear and conveys a definite and precise intent." *Nation-Bailey*, 316 Conn. at 192. The language of the contract "must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Id.* "The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." *Id.* If, after applying these principles, a contract is "susceptible to more than one reasonable interpretation," then it is ambiguous. *Id.* On the other hand, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Here, ADT argues that Prysmian has failed to plead a breach of contract because it has not identified any specific provision of the contract that ADT allegedly violated on November 7, 2021. Mem. at 12. It further notes that, even if there was a breach of contract, the Agreement explicitly excludes liability for "LOSSES ARISING DIRECTLY OR INDIRECTLY FROM

ANY SYSTEM FAILURE EVENTS." *Id.* at 10 (quoting Service Agreement § 13(b)). ADT

contends that the facts alleged by Prysmian fall within this exclusion. *Id.* at 11.

In response, Prysmian argues that ADT breached two specific contractual provisions: (1)

the requirement that "the Services provided pursuant to this agreement shall be performed in

accordance with sound and generally acceptable practices and procedures and normally accepted

standards in the field; and (2) the requirement that ADT must "comply with any requirements

and policies provided by Customer in connection with this Agreement." Opp'n at 9 (quoting

Service Agreement § 8). Prysmian also argues that the liability exclusion cited by ADT does not

apply because ADT's disarming of the security system was not a "System Failure Event," as that

term is defined in the contract. Opp'n at 6–7.

The Court agrees, in part.

### 1. The Contractual Duties Breached

"In asserting a breach of contract claim, the complaint must allege the provisions of the

contract upon which the claim is based." *Timmons v. City of Hartford*, 283 F. Supp. 2d 712, 718

(D. Conn. 2003). Prysmian's breach of contract claim focuses primarily on ADT's alleged

violation of the requirement that it obtain permission from two designated Prysmian employees

before disarming the system. Compl. ¶¶ 34–35. The Agreement, however, does not specifically

require ADT to seek these approvals. Instead, Prysmian points to ADT's obligation to "comply

with any requirements and policies provided by Customer in connection with this Agreement."

*Id.* ¶ 21. Prysmian alleges that it informed ADT of the notification requirement at some

unspecified time in accordance with this provision. Service Agreement § 8; Compl. ¶ 22. But

neither party has cited any cases addressing whether this type of promise to comply with

unidentified future conditions is enforceable under Connecticut law, and the Court has identified none. *See* Opp'n at 9.

The Court, however, need not resolve this issue at the motion to dismiss stage because Prysmian has plausibly alleged that ADT violated an adjacent clause requiring ADT to perform its services "in accordance with sound and generally accepted practices and procedures and normally accepted standards in the field." Service Agreement § 8. Although this provision is not quoted specifically in the section of the Complaint setting out the breach of contract claim, that section does allege that ADT "breached Section 8" of the Agreement "by disarming Plaintiff's security system without obtaining the necessary approvals." Compl. ¶ 35. This specific clause in § 8 is also quoted earlier in the Complaint and incorporated by reference in the breach of contract count. *Id.* ¶¶ 21, 31.

ADT argues that this provision does not impose a specific duty to obtain permission from designated Prysmian employees before disarming the system. But construing the Complaint "in the light most favorable to the plaintiff," *York*, 286 F.3d at 125, Prysmian has sufficiently alleged that ADT's unilateral decision to disarm the system for hours—without obtaining permission from or even informing Prysmian employees—was not in accordance with sound practices or normally accepted standard in the field. The determination of security industry standards is a factual matter that the Court may not resolve at the pleading stage. *See Philadelphia Indem. Ins. Co. v. Lennox Indus., Inc.*, No. 3:18-cv-00217 (CSH), 2020 WL 705263, at *4 (D. Conn. Feb. 12, 2020) ("While PIIC's complaint would certainly benefit from inclusion of additional details regarding Defendants' manufacturing specifications or the industry's standards or regulations, PIIC is not required to plead detailed or elaborate factual allegations to survive a motion to dismiss." (internal quotation marks omitted)). Here, Prysmian's allegations raise a plausible

claim for violation of such standards even if Prysmian had not specifically directed ADT to obtain permission from certain designated employees before disarming the system.

### 2. The Limitation of Liability Provisions

Section 13(b) of the Service Agreement provides that ADT "SHALL NOT BE LIABLE FOR ANY LOSSES ARISING DIRECTLY OR INDIRECTLY FROM ANY SYSTEM FAILURE EVENTS." Thus, to determine whether this provision precludes ADT's liability in this case, the Court must identify the meaning of the term "System Failure Events."

The Service Agreement does not contain a definitions section; instead, "System Failure Events" is defined in a clause in § 13(a) which states that "Service Provider's obligations under this Paragraph shall not apply to Losses not attributable to Service Provider arising out of the condition, non-function, malfunction, faulty design, or failure of the Equipment to operate or perform as intended ('System Failure Events')." In the context of this sentence, "System Failure Events" can refer either to "Losses not attributable to Service Provider arising out of the condition, non-function, malfunction, faulty design, or failure of the Equipment to operate or perform as intended" or more narrowly to "the condition, non-function, malfunction, faulty design, or failure of the Equipment to operate or perform as intended." Prysmian argues for the former definition, Opp'n at 4, while ADT favors the latter, Mem. at 3.

As noted above, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Nation-Bailey*, 316 Conn. at 192. The Court must first exhaust the principles of contractual interpretation before concluding that the term "System Failure Events" is susceptible of more than one reasonable interpretation.

Based on the plain language of the Agreement alone, neither definition is without its challenges. Under ADT's preferred definition, System Failure Events are "the condition, non-function, malfunction, faulty design, or failure of the Equipment to operate or perform as intended." But the "condition" or "faulty design" of an alarm system refers to its continuous state and is not naturally described as an "Event," a term that ordinarily refers to an "outcome" or "occurrence," *Event*, Oxford English Dictionary (3d ed. 2018).

Prysmian, meanwhile, argues that System Failure Events refer to "Losses not attributable to Service Provider" that arise out of the malfunction, faulty design, or other problem with the alarm system. The term "Losses" is itself defined as

> "losses, costs, obligations, liabilities, damages, actions, suits, causes of action, claims, allegations, demands, liens, encumbrances, security interests, settlements, judgments, and other expenses, (including but not limited to cost of defense, settlement, and reasonable attorney's fees) of whatever type or nature, including, but not limited to, damage or destruction to property, injury (including death) to any person or persons, which are asserted against, incurred, imposed upon or suffered by Customer."

Service Agreement § 13(a). Some of the items included in this definition, such as "obligations" or "liabilities" are not naturally defined as "Events," either.

Looking beyond the plain language, the Court considers the way that the term "System Failure Events" is used throughout the Agreement. *See Nation-Bailey*, 316 Conn. at 192 ("The contract must be viewed in its entirety, with each provision read in light of the other provisions."). At this step, the meaning of the term becomes clear. Section 13(b) absolves ADT of liability for "ANY LOSSES ARISING DIRECTLY OR INDIRECTLY FROM ANY SYSTEM FAILURE EVENTS." If the Court were to substitute Prysmian's definition into this clause, it would read: "ANY LOSSES ARISING DIRECTLY OR INDIRECTLY FROM ANY [Losses not attributable to Service Provider arising out of the condition, non-function,

11

malfunction, faulty design, or failure of the Equipment to operate or perform as intended]." Such a provision limiting ADT's liability for losses arising from other losses would make little sense, and Prysmian has offered no potential explanation for it.

When interpreting the Service Agreement, "every provision must be given effect if it is possible to do so." *Nation-Bailey*, 316 Conn. at 192. Thus, the Court will adopt ADT's definition, which fits logically into § 13(b)'s limitation on liability for "ANY LOSSES ARISING DIRECTLY OR INDIRECTLY FROM ANY [condition, non-function, malfunction, faulty design, or failure of the Equipment to operate or perform as intended]."

Applying this definition, Prysmian's losses in this case arose, at least indirectly, from System Failure Events. Prysmian does not dispute that the false alarms themselves qualified as System Failure Events, as malfunctions or failures of the alarm system to operate as intended. Prysmian also admits in its Complaint that ADT disarmed the system because it "apparently wanted to avoid having to deal with" the false alarms. Compl. ¶ 24. Thus, although ADT's decision to disarm the system may have been a more proximate cause of Prysmian's losses, these losses arose indirectly from a System Failure Event under the unambiguous language of the Agreement.

Prysmian objects that ADT cannot rely on this reasoning when ADT itself made the decision to disarm the system, but the Second Circuit has interpreted similar language broadly in an analogous case. In *Gibbs-Alfano v. Burton*, 281 F.3d 12 (2d Cir. 2002), the court considered whether an agreement requiring a boat club to indemnify a municipality for "any and all claims . . . arising directly or indirectly" out of the club's performance of a license agreement with the municipality applied to claims against the municipality for failure to investigate the boat club's misconduct. *Id.* at 15–16. When faced with the boat club's misconduct, the municipality

allegedly "chose not to investigate" and therefore, as in this case, made an intervening decision that provided the proximate basis for the plaintiffs' claim. *Id.* at 16. Nonetheless, the Second Circuit held that the indemnification clause applied because "the Town Defendants' duty to investigate would never have been invoked but for the Boat Club's malfeasance." *Id.* at 16, 19. Here, because ADT never would have been prompted to turn off the system if not for the false alarms, its Prysmian's losses arose indirectly from those false alarms.

There is, however, a more intractable problem with ADT's invocation of the limitation of liability provision in this case. Immediately after stating that ADT shall not be liable for any losses arising from any system failure events, § 13(b) goes on to provide,

> IF SERVICE PROVIDER OR ANY PERSON OR ENTITY AFFILIATED WITH SERVICE PROVIDER IS DETERMINED TO BE LIABLE FOR ANY LOSSES DUE TO A SYSTEM FAILURE EVENT IN ANY RESPECT, THEIR LIABILITY SHALL BE STRICTLY LIMITED TO $50,000.00 PER CLAIM . . . . THIS AMOUNT IS CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, REGARDLESS OF WHETHER THE LOSSES ARE CAUSED BY SERVICE PROVIDER'S NEGLIGENCE (ACTIVE, PASSIVE OR OTHERWISE) UNLESS SUCH LOSSES ARE CAUSED DIRECTLY BY SERVICE PROVIDER'S SOLE OR GROSS NEGLIGENCE, OR INTENTIONAL MISCONDUCT; IN WHICH CASE THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY.

Service Agreement § 13(b). The effect of this provision is that, if the preceding absolute limitation on liability for claims arising from a system failure event does not apply (because it was determined to be invalid, for example), ADT's liability for such claims will be limited to $50,000.

The quoted passage also provides that "THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY" if the losses are caused directly by ADT's "SOLE OR GROSS NEGLIGENCE, OR INTENTIONAL MISCONDUCT." *Id.* It is not immediately clear

from this language whether "the foregoing limitation of liability" refers only to the $50,000 per-claim limit or to the preceding sentence as well, which contains the absolute limitation on liability discussed above. The phrase "foregoing limitation of liability" comes at the end of a sentence that begins with "THIS AMOUNT," a reference to the $50,000 limit, which suggests that the exception for recklessness[1] or intentional misconduct applies only to the $50,000 per-claim limitation set forth in the second sentence of § 13(b), and not to the absolute liability limitation contained in the first sentence.

This interpretation, however, would immunize ADT from liability in circumstances where the absolute liability limitation applied but the losses were caused by ADT's recklessness or intentional misconduct. The Second Circuit, applying Connecticut law, has upheld a liability limitation provision in an agreement for fire alarm services, noting that many other courts "have similarly upheld clauses limiting liability for the failure of [burglar alarm] systems." *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir. 1993). *Leon's Bakery* did not, however, address whether such a provision could exculpate a party from recklessness or intentional misconduct.[2]

A court in this District confronted a purported limitation on liability for recklessness in *Western Alliance Insurance Co. v. Wells Fargo Alarm Services, Inc.*, 965 F. Supp. 271, 279 (D.

---

[1] "Connecticut does not recognize degrees of negligence and, consequently, does not recognize the tort of gross negligence as a separate basis of liability." *Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 337 (2005). Thus, an enforceable provision that absolves a party of liability for negligent conduct would "release their liability for such conduct unless it rose to the level of *recklessness*." *Id.* In light of this feature of Connecticut law, the Court will refer henceforth to "recklessness or intentional misconduct," even though § 13(b) refers to "gross negligence or intentional misconduct."

[2] Several cases in this District have relied on *Leon's Bakery* to uphold exculpatory provisions that purported to explicitly limit liability for gross negligence, although those cases did not discuss gross negligence, and the underlying facts did not raise an inference of gross negligence. *See Nat'l Sur. Corp. v. Minchin Buick Pontiac GMC, Inc.*, No. 3:10-cv-1330 JCH, 2011 WL 3164845, at *4 (D. Conn. July 26, 2011) (residential garage caught fire and alarm never sounded or transmitted a signal to the defendant's central monitoring station); *Omni Corp. v. Sonitrol Corp.*, 476 F. Supp. 2d 125, 127 (D. Conn. 2007) (pipe burst and alarm services provider failed to notify the plaintiff or emergency services).

Conn. 1997), *report and recommendation adopted*, 965 F. Supp. at 272. In that case, the terms of

a commercial lease provided, without any exceptions, "that Landlord shall not be liable to

Tenant . . . for any damage to, or loss . . . of, any property of Tenant of any kind or nature." *Id.* at

277. The court noted that these broad terms could "be read as exonerating the landlord from

conduct constituting gross negligence, recklessness and intentional conduct" and, because

Connecticut courts had not addressed the issue, considered whether such a limitation on liability

likely would be enforceable under Connecticut law. *See id.* at 278–79. Turning to the sources

typically consulted by the Connecticut Supreme Court, the court noted that the Restatement of

Contracts and cases from other jurisdiction "provide that a party should not be permitted to

exempt itself from liability for its gross negligence."[3] *Id.* at 279 (citing *Colnaghi U.S.A., Ltd. v.

Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 283–84 (N.Y. 1993)). Ultimately, the court

concluded that the terms of the lease "should not be deemed a valid limitation of . . . liability for

gross negligence, recklessness and intentional acts" because "they do not conspicuously, clearly

and unequivocally isolate the landlord from liability for such conduct, and because it does not

appear that the Connecticut Supreme Court would uphold such a broad exculpatory provision

under the circumstances presented." *Id.* (citing *Griffin v. Nationwide Moving & Storage Co.*, 187

Conn. 405 (1982); and *Tremblay v. Theiss*, 152 A.D.2d 793, 794 (N.Y. App. Div. 1989)).

Although *Western Alliance* was decided over twenty-five years ago, Connecticut courts

do not appear to have addressed this issue in the intervening period.[4] One Connecticut Superior

---

[3] Because "[r]ecklessness is . . . more than gross negligence," *Dubay v. Irish*, 207 Conn. 518, 532 (1988), these
authorities also support the principle that a party should not be able to exempt itself from liability for recklessness.

[4] In *Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314 (2005), the Connecticut Supreme Court held that operators
of recreational facilities could not release themselves from prospective liability for negligent conduct because such
limitations on liability would violate public policy. *Id.* at 335–36. A court in this District later rejected the argument
that *Hanks* displaced the rule articulated in *Leon's Bakery* that limitation of liability provisions in alarm services
contracts are enforceable, concluding that the decision in *Hanks* was limited to the particular context of recreational

Court, in a case decided before *Western Alliance*, noted that, "[w]hile it does not appear that the appellate courts of this state have considered the enforceability of contractual provisions limiting the liability of burglar alarm installers, the courts of other states have given them effect where only ordinary negligence, and not gross negligence, is proven." *V.P. Enters., Inc. v. A.J.T. Burglar Alarm Sys., Inc.*, No. CV 91-03311773-S, 1993 WL 393840, at *5 (Conn. Super. Ct. Sept. 20, 1993). Although the Connecticut court concluded that the complaint alleged only ordinary negligence, and therefore upheld the limitation of liability provision, this comment suggests that the district court's analysis in *Western Alliance* applies to burglar alarm contracts as well as to commercial leases. Thus, "because it does not appear that the Connecticut Supreme Court would uphold such a broad exculpatory provision," the absolute limitation of liability provision in the first sentence of § 13(b) is not enforceable with respect to claims for recklessness or intentional misconduct. *Western Alliance*, 965 F. Supp. at 279.

Because the limitation of liability provision is not enforceable as to such claims, the Court must determine whether Prysmian has alleged at least reckless misconduct. Under Connecticut law, "[r]ecklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent."[5] *Doe v. Boy Scouts of Am. Corp.*, 323 Conn. 303, 330 (2016) (quoting *Doe* v.

---

facility operators. *See Omni Corp. v. Sonitrol Corp.*, 476 F. Supp. 2d 125, 128 (D. Conn. 2007). But as with *Leon's Bakery*, neither *Hanks* nor *Omni Corp.* considered whether a limitation of liability provision could bar recovery for recklessness or intentional misconduct.

[5] ADT argues that intent to cause Prysmian's losses is a required element of a recklessness claim and that Prysmian has failed to plead it. *See* Reply at 5 (citing *2–4 Broad St., LLC v. Instant Replay Bar & Rest., LLC*, No. CV216044766S, 2021 WL 6551969, at *4 (Conn. Super. Ct. Dec. 30, 2021)). The case cited by ADT, *2–4 Broad St.*, relies for this proposition on a Connecticut Supreme Court decision which described the definitions the court had

*Hartford Roman Cath. Diocesan Corp.*, 317 Conn. 357, 382 (2015)). Recklessness "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Matthiessen v. Vanech*, 266 Conn. 822, 833 (2003) (quoting *Craig v. Driscoll*, 262 Conn. 312, 342–43 (2003)).

Here, Prysmian has plausibly alleged that ADT consciously chose a course of action that involved an extreme departure from ordinary care, in a situation where a high degree of danger was apparent. According to the Complaint, Prysmian and ADT "had extensive discussions about the nature of Plaintiff's business and the fact that providing constant surveillance and protection from theft is critical to Plaintiff's business." Compl. ¶ 16. Viewing the Complaint in the light most favorable to Prysmian, ADT was aware that the high price of copper "makes Plaintiff a target for criminals," which in turn "places Plaintiff's property and employees in danger." *Id.* ¶¶ 14–15.

Despite its knowledge of this serious danger, ADT made the deliberate decision to disarm Prysmian's alarm system. *Id.* ¶ 24. It did so without informing Prysmian and in violation of Prysmian's instruction that ADT must obtain approval from designated employees before disarming the system *Id.* ¶ 25. ADT did not even rearm the system until Prysmian informed it of the robbery the next morning. *Id.* ¶ 29. Prysmian has plausibly alleged that this conduct constitutes an extreme departure from ordinary care, as other courts have concluded in similar

---

previously provided for the terms "willful," "wanton," and "reckless." *Dubay v. Irish*, 207 Conn. 518, 533 (1988). The Connecticut Supreme Court noted that, despite its attempts to draw definitional distinctions, the three terms had in practice "been treated as meaning the same thing" and summarized their collective usage as "tak[ing] on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.* Neither *Dubay* nor the other Connecticut Supreme Court decisions cited above suggest that an intent to cause the resulting injury is a requirement for recklessness. In any event, it is not clear that the court's reasoning in *2–4 Broad St.* would foreclose the claim brought here. *See* 2021 WL 6551969 at *4 (noting that "this Court has denied motions to strike complaints that alleged conduct which created significant dangers and the respective defendant had a reckless state of mind."). The factual allegations here—totally disarming the alarm system and leaving a customer who had expressly sought its protection with none—arguably satisfy that court's standard.

circumstances. *See Douglas W. Randall, Inc. v. AFA Protective Sys., Inc.*, 516 F. Supp. 1122,

1126–27 (E.D. Pa. 1981) ("If the defendant, in repairing the alarm system, turned the sensitivity

level of the system down to such a low level that the system would not detect the entry of a

person into the store, the Court cannot conclude that the jury erred in finding that the defendant's

actions . . . constituted gross negligence."), *aff'd*, 688 F.2d 820 (3d Cir. 1982); *Fed. Ins. Co. v.

Automatic Burglar Alarm Corp.*, 208 A.D.2d 495, 496 (N.Y. App. Div. 1994) (holding that "the

plaintiff's allegations regarding the defendant's prior notice of the malfunctioning of Cross Bay's

burglar alarm system and the defendant's servicing and repair of that system raise issues of fact

with respect to whether or not the defendant was grossly negligent").[6]

Accordingly, because the limitation of liability provision is enforceable except as to

claims for recklessness or intentional misconduct and because Prysmian has plausibly alleged

that ADT's conduct was at least reckless, the Court will deny ADT's motion to dismiss

Prysmian's breach of contract claim.[7]

## B.  The Recklessness Claim

The foregoing discussion of Prysmian's breach of contract claim shows that Prysmian has

plausibly alleged that ADT's conduct was at least reckless. Nonetheless, ADT argues that

Prysmian cannot maintain a separate claim for recklessness because Connecticut law does not

---

[6] Although both of these cases were decided under a gross negligence standard, the relevant jurisdictions define gross negligence as requiring "an extreme departure from ordinary care" and "reckless disregard of the consequences," *Douglas W. Randall, Inc.*, 516 F. Supp. at 1126, or as "conduct that evinces a reckless disregard for the rights of others or that smacks of intentional wrongdoing," *Federal Insurance Co.*, 208 A.D. 2d at 496. *See also Hanks*, 276 Conn. at 350 (Norcott, J., dissenting) (noting that many states "define gross negligence in a way that mirrors Connecticut recklessness law").

[7] Because Prysmian has plausibly alleged that ADT's conduct was at least reckless, the Court will not dismiss Prysmian's claim for punitive damages. *See L.F. Pace & Sons, Inc. v. Travelers Indem. Co.*, 9 Conn. App. 30, 48 (1986) (holding that punitive damages are available for breach of contract only if "an underlying tort or tortious conduct" is alleged that contains elements "such as wanton or malicious injury or reckless indifference to the interests of others"); *Ulbrich v. Groth*, 310 Conn. 375, 447 (2013) (upholding a punitive damages award under CUTPA because "the trial court reasonably could have found that the bank's conduct was reckless").

recognize a cause of action for reckless breach of contract. Mem. at 8. In response to this argument, Prysmian notes only that it is permitted to plead duplicative and inconsistent theories of recovery in its Complaint. Opp'n at 10.

The Court agrees, for now.

Connecticut does not recognize a cause of action for willful, wanton, reckless breach of contract. *2–4 Broad St., LLC v. Instant Replay Bar & Rest., LLC*, No. CV216044766S, 2021 WL 6551969, at *3 (Conn. Super. Ct. Dec. 30, 2021) (quoting *Bardon Tool & Mfg. Co. v. Torrington Co.*, No. CV 960473455S, 1996 WL 677254, at *2 (Conn. Super. Ct. Oct. 31, 1996)). "To be legally sufficient" under Connecticut law, a claim for "reckless and wanton misconduct must . . . allege some duty running from the defendant to the plaintiff." *Sheiman v. Lafayette Bank & Tr. Co.*, 4 Conn. App. 39, 46 (1985).

Here, Prysmian alleges that ADT knowingly disregarded a substantial risk of harm to Prysmian after being "hired specifically to protect Plaintiff's interests." Thus, the only alleged duty running from ADT to Prysmian in this case appears to arise from their contractual relationship. Because Prysmian has not identified any independent duty that was breached, it likely cannot maintain a claim for recklessness. *See Meza v. Merritt River Partners LLC*, No. 3:16-CV-1871 (SRU), 2020 WL 5201007, at *4 (D. Conn. Sept. 1, 2020) (applying Connecticut law and rejecting plaintiff's argument that "its claim for recklessness 'does not plead a reckless breach of contract' and instead 'pleads a tort based on . . . financial losses that exists separately from any breach'").

Nonetheless, because permitting the recklessness claim "to remain in the case will not expand discovery," the Court need not decide at this stage whether Prysmian's recklessness claim "must be dismissed as duplicative of the contract claim." *Baidu, Inc. v. Register.com, Inc.*,

760 F. Supp. 2d 312, 320 n.6 (S.D.N.Y. 2010). ADT is free to renew its argument at the summary judgment stage or at trial. *See id.*

### C.  The Fraudulent and Negligent Misrepresentation Claims

Prysmian asserts claims for fraudulent and negligent misrepresentation based on ADT's failure to disclose its decision to disarm Prysmian's security systems.

To state a claim for fraudulent misrepresentation, a plaintiff must plausibly allege that "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142 (2010) (quoting *Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Invs., L.P.*, 260 Conn. 766, 777 (2002)). The plaintiff must also allege that they relied on the defendant's representation and that they suffered harm as a result of the reliance. *Id.*

"Fraud by nondisclosure, which expands on the first three of [the] four elements [of fraud], involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak." *Reville v. Reville*, 312 Conn. 428, 441 (2014) (alterations in original) (internal quotation marks omitted). "A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." *Id.* (internal quotation marks omitted).

A claim for negligent misrepresentation, meanwhile, requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and

(4) suffered pecuniary harm as a result. *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006).

Like a claim for fraudulent misrepresentation, "[a] negligent misrepresentation claim may be based on the defendant's omissions." *Off. Furniture Rental All., LLC v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 111, 120 (D. Conn. 2013) (citing *Brouillard v. United Illuminating Co.*, No. CV 980418595, 1999 WL 390992, at *5 (Conn. Super. Ct. June 1, 1999)). "Such a cause of action based on omission arises only if the defendant had a duty to disclose the omitted information." *Id.*

Here, as with the recklessness claim, ADT argues that Prysmian's claims for fraudulent misrepresentation and negligent misrepresentation should be dismissed as duplicative of the breach of contract claim. Mem. at 10, 13. ADT also contends that Prysmian has not alleged sufficient facts to state a claim for either fraudulent or negligent misrepresentation. *See id.* at 10–15.

In response, Prysmian again argues that it is entitled to plead claims that are inconsistent with contractual liability. *See* Opp'n at 12. Prysmian also disputes ADT's assertion that the allegations of the Complaint are insufficient to state claims for fraudulent and negligent misrepresentation. *See id.* at 12–15.

The Court agrees with ADT.

In some circumstances, claims for fraudulent and negligent misrepresentation may be pursued alongside claims for breach of contract when they are "independent" of the contract claim. *Ulbrich v. Groth*, 310 Conn. 375, 406 (2013) ("[A] remedy on the contract and a remedy for negligent misrepresentation *may be* independent remedies."); *see also Wilenta Feed, Inc. v. Arnold Food Co.*, No. 3:04-cv-1090 (RNC), 2006 WL 798916, at *2 (D. Conn. Mar. 29, 2006)

("Claims for wrongfully inducing a party to enter into a contract can be pursued along with a claim for breach of contract.").

On the other hand, "[a]llegations that a party has been defrauded because of a breach of contract are 'nothing more than breach of contract allegations.'" *Wilenta Feed*, 2006 WL 798916, at *2 (quoting *Gen. Elec. Cap. Corp. v. DirecTv, Inc.*, 94 F. Supp. 2d 190, 202 (D. Conn. 1999)). Thus, when "the defendants' duty to the plaintiff[] arose exclusively out of the contractual relationship," misrepresentation claims cannot be maintained separately from breach of contract claims. *Ulbrich*, 310 Conn. at 405 (concluding that tort claims are not independent from contract claims when both "are premised on the same alleged conduct with respect to the same personal property and rely on the same evidence"); *see also U.S. Reg'l Econ. Dev. Auth., LLC v. Matthews*, No. 3:16-cv-01093 (CSH), 2017 WL 5992384, at *7 (D. Conn. Dec. 4, 2017) ("[W]here a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." (alteration in original) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996))).

Prysmian's fraudulent misrepresentation claim alleges that ADT fraudulently failed to disclose that it was disarming the alarm system so that Prysmian would "wrongly continue employing Defendant as its sole surveillance vendor." Compl. ¶ 52. But courts in this District have rejected claims merely for "fraudulent inducement to continue performing a contract." *General Electric*, 94 F. Supp. 2d at 202; *see also Wallingford Shopping, L.L.C. v. Lowe's Home Centers, Inc.*, No. 98-cv-8462 (AGS), 2001 WL 96373, at *14 (S.D.N.Y. Feb. 5, 2001) ("At most, then, Lowe's alleged non-disclosure . . . led WSL to continue to act under the terms of the

Agreement, on the belief that Lowe's, too, was continuing to perform as it had promised. Such allegations are duplicative of those implicated by WSL's breach of contract claim and are not cognizable as fraud under Connecticut law.").

Here, Prysmian concedes that, as a general proposition, "allegations that a party has been defrauded because of a breach of contract are nothing more than breach of contract allegations." Opp'n at 12. Because the Court will allow Prysmian's breach of contract claim to proceed, the fraudulent and negligent misrepresentation counts are duplicative of the breach of contract count, and Prysmian has identified no independent basis for these misrepresentation claims.

Accordingly, the Court will grant ADT's motion to dismiss the fraudulent misrepresentation and negligent misrepresentation claims.

### D.  The CUTPA Claim

The Connecticut Unfair Trade Practices Act provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). In determining whether a method of competition or business practice violates CUTPA, Connecticut courts follow the "cigarette rule" formerly used by the Federal Trade Commission. *See Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 338 Conn. 189, 232 (2021).

Under this rule, courts must consider three factors:

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Id.* (alterations in original).

ADT argues that a mere breach of contract is insufficient to establish a CUTPA claim and that Prysmian has not alleged the type of "substantial aggravating factors" required to elevate a breach of contract to a CUTPA violation. *See* Mem. at 15–16.

In response, Prysmian notes that a breach of contract can support a CUTPA claim and that ADT's conduct in this case "has the hallmarks of unscrupulousness and unethicalness that can elevate a contract breach into a deceptive act under the CUTPA." *See* Opp'n at 14–15.

The Court agrees.

"A simple breach of contract cannot constitute a violation of the Connecticut Unfair Trade Practices Act." *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1040 (2d Cir. 1995). "CUTPA was intended to provide a remedy that is separate and distinct from the remedies provided by contract law when the defendant's contractual breach was accompanied by aggravating circumstances." *Ulbrich*, 310 Conn. at 411; *see also Greene v. Orsini*, 50 Conn. Supp. 312, 315 (Super. Ct. 2007) ("A simple breach of contract does not offend traditional notions of fairness and, standing alone, does not offend public policy so as to invoke CUTPA. A CUTPA claim lies where the facts alleged support a claim for more than a mere breach of contract. Depending upon the nature of the assertions, however, the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation.").

In cases where the plaintiff's loss arose from a breach of contract, courts must determine "whether the defendant's breach of contract was merely negligent or incompetent, in which case the CUTPA claim was barred, or whether the defendant's actions would support a finding of intentional, reckless, unethical or unscrupulous conduct." *Ulbrich*, 310 Conn. at 410. If reckless conduct is found, "the contractual breach will support a CUTPA claim under the second prong of the cigarette rule." *Id.*

As discussed above, Prysmian has plausibly alleged that ADT's conduct in unilaterally disarming the system was reckless. Thus, under the standard set forth in *Ulbrich*, these allegations are sufficient to state a claim under CUTPA. *See also Lester v. Resort Camplands Int'l, Inc.*, 27 Conn. App. 59, 71 (1992) (upholding a jury verdict on a CUTPA claim when the jury had found that the defendant's acts were "intentional or with reckless disregard of the Plaintiffs' rights").

Furthermore, Connecticut courts have concluded that a "[n]egligent misrepresentation suffices as a basis for a CUTPA claim and as an aggravating factor making a breach of contract action also the basis of a CUTPA claim." *Romulan Realty, LLC v. Old Lyme Prods., Inc.*, No. CV115014161S, 2011 WL 6934754, at *2 (Conn. Super. Ct. Dec. 7, 2011). Although Prysmian's negligent misrepresentation claim will be dismissed as duplicative of its breach of contract claim, Prysmian has adequately alleged that ADT had a duty to disclose the disarming of the system; that ADT intentionally and misleadingly failed to do so; that Prysmian relied on its believe that the system was armed; and that Prysmian suffered losses as a result. *See Centimark Corp. v. Vill. Manor Assocs. Ltd. P'ship*, 113 Conn. App. 509, 523 (2009) (upholding a finding that the defendant roofing contractor violated CUTPA by misrepresenting to the landowner that shingling work would be done by highly qualified contractors when the defendant knew the shingling would be subcontracted to less qualified workers).

Accordingly, the Court will deny ADT's motion to dismiss the CUTPA claim.

## IV.   CONCLUSION

For the foregoing reasons, ADT's motion to dismiss is **GRANTED in part** and **DENIED in part**.

ADT's motion is granted as to the claims for fraudulent and negligent misrepresentation and denied as to the claims for breach of contract, recklessness, and violation of CUTPA, and as to the request for punitive damages.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of March, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE